No. 22-55990

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

NATURAL-IMMUNOGENICS CORP., a Florida corporation,

Plaintiff-Appellee,

v.

DAVID J. DARNELL; JAMES M. SABOVICH,

Appellants,

and

NEWPORT TRIAL GROUP, a California Corporation; SCOTT J. FERRELL, a California resident; RYAN M. FERRELL, an Arizona resident; VICTORIA C. KNOWLES, a California resident; ANDREW LEE BASLOW, a California resident; ANDREW NILON, a California resident; SAM PFLEG, a California resident; MATTHEW DRONKERS, a California resident; TAYLOR DEMULDER, a Nevada resident; SAM SCHOONOVER, a California resident; GIOVANNI SANDOVAL, an Arizona resident,

Defendants.

---

Appeal from a Decision of the United States District Court,
Central District of California, Southern Division
(No. 8:15-cv-02034-JVS-JCG) • Honorable James V. Selna

---

**APPELLANTS' OPENING BRIEF**

---

CALLAHAN & BLAINE, APLC
David J. Darnell (SBN 210166)
James M. Sabovich (SBN 218488)
3 Hutton Centre Drive, Ninth Floor
Santa Ana, California 92707
Telephone: (714) 241-4444 / Facsimile: (714) 241-4445
Appellants Pro Se

## RULE 26.1 CORPORATE DISCLOSURE

Because none of the appellants are a private, non-governmental party, a Rule 26.1 corporate disclosure statement is not required.

Dated:  March 1, 2023                    **CALLAHAN & BLAINE, APLC**

By:  /s/ James M. Sabovich
      David J. Darnell
      James M. Sabovich
      Appellants Pro Se

## STATEMENT REGARDING ORAL ARGUMENT

Appellants David Darnell and James Sabovich respectfully request oral argument. This appeal challenges the District Court's finding that the filing of a compulsory RICO Counterclaim was sanctionable misconduct due to the statute of limitations and *Noerr-Pennington*. Based on a misreading of both doctrines, the District Court found that a RICO claim that arose almost entirely while the action was pending and where the last damage-causing predicate act had occurred months earlier was barred by RICO's four-year statute of limitations. It similarly found the allegations to be barred by *Noerr-Pennington* immunity by imposing a reliance requirement even though this Court had long ago disavowed such a requirement and even though the Counterclaim contained allegations bringing it within the fraud exception. Then, without any evidence of a lack of diligence and despite these being complex and conflicting legal doctrines, the District Court found the Counterclaim to have been filed without the Rule 11 required inquiry and imposed sanctions on counsel personally. Appellants believe that oral argument, during which their counsel can answer factual queries and hypothetical scenarios, will

assist this Court in determining that they should not have been

sanctioned for filing the Counterclaim on behalf of their client.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether Newport Trial Group ("NTG") was required to seek leave before filing the Counterclaim after Plaintiff Natural Immunogenics Corp. ("NIC") filed an amended Counterclaim adding new allegations and when the Counterclaim was based almost entirely on events that occurred during the pendency of the action.

2. Whether the District Court erred in finding that the Counterclaim was barred by the four-year statute of limitations when almost all predicate acts occurred while the action was pending and at least three alleged injuries occurred within the statutory period.

3. Whether the District Court erred in holding as a matter of law that allegations of filing false declarations, witness tampering, extortion, suborning perjury, impersonating a law enforcement officer, and filing false claims were subject to *Noerr-Pennington* immunity and outside the sham litigation exception to that doctrine.

4. Whether the District Court erred in holding the sham litigation exception to *Noerr-Pennington* requires reliance when the Ninth Circuit has long held that there was no "require[ment] that the body on whom the fraudulent misstatements are pressed ultimately

believe those statements." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc*., 690 F.2d 1240, 1262 (9th Cir. 1982).

5.     Whether the District Court erred in holding that Appellants failed to perform a reasonable investigation when Appellee failed to present any evidence on that point and the issues – whether leave is required for a counterclaim, statute of limitations accrual in RICO cases, and applicability of *Noerr-Pennington* immunity – involve complex and partially conflicting legal issue.

## STATEMENT OF RELATED CASES

Appellants give notice to this Court and the Court's Clerk of the following related cases pending in this Court, under Ninth Circuit Rule 28-2.6, which arise out of the same case in the District Court:

*Natural Immunogenics Corp. v. Newport Trial Group*, et. al., Case No. 22-55992

Dated:  March 1, 2023          **CALLAHAN & BLAINE, APLC**

By:  /s/ James M. Sabovich
      David J. Darnell
      James M. Sabovich
      Appellants Pro Se

# **TABLE OF CONTENTS**

**Page**

RULE 26.1 CORPORATE DISCLOSURE ........................................................ 2

STATEMENT REGARDING ORAL ARGUMENT ......................................... 3

STATEMENT OF ISSUES PRESENTED FOR REVIEW ................................ 5

STATEMENT OF RELATED CASES ............................................................. 7

I.  INTRODUCTION .................................................................................. 17

II.  PROCEDURAL HISTORY ................................................................... 21

    A.  In Late 2019, NIC Seeks "Death Penalty"
        Sanctions Using Declarations it Knew to be False ......................... 22

    B.  NIC Files an Amended Complaint, Requiring
        Appellants to Assert Their Client's Compulsory
        Counterclaim ................................................................................... 26

    C.  The Counterclaim Allegations ........................................................ 30

    D.  The District Court Erroneously Grants Rule 11
        Sanctions against Appellants .......................................................... 33

III.  THE ORDER IS ERRONEOUS AND MUST BE
     RESERVED ............................................................................................ 37

    A.  The District Court Erred Because Reasonable
        Investigation Demonstrated that Leave Was Not
        Required to Bring a Compulsory Counterclaim ............................. 41

        1.  The Counterclaim Was Probably
            Compulsory ............................................................................ 43

        2.  The Counterclaim Probably Satisfied the
            "Moderate" Approach Because NIC's
            Amended Complaint Added a New Theory
            and Changed the RICO Enterprise ........................................ 48

3.      The Counterclaim Certainly Satisfied the
        "Permissive" Approach .......................................................... 53

B.      A Reasonable Reading of the Case Law Indicated
        the Counterclaim Was Not Time Barred .......................................... 53

C.      Reasonable Investigation Showed that the False
        Perjury Claims Likely Fell within the Fraud
        Exception ............................................................................ 59

        1.      The False Perjury Claims Are Not
                Dispositive of the Statute of Limitations as
                the District Court Found ...................................................... 61

        2.      The District Court Erred in Finding that
                NTG Could Not Satisfy the Fraud Exception
                to *Noerr-Pennington*.......................................................... 61

D.      The District Court Erred in Awarding Sanctions
        When There Was No Showing that Allegations
        Were Made without a Reasonable Inquiry ...................................... 69

IV.   CONCLUSION ........................................................................ 73

CERTIFICATE OF COMPLIANCE ................................................... 74

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3BA Int'l LLC v. Lubahn*,
No. C10-829RAJ, 2012 WL 2317563
(W.D. Wash. June 18, 2012) ......................................................... 41

*Adobe Sys. Inc. v. Coffee Cup Partners, Inc.*,
2012 WL 3877783 .......................................................................... 49

*Amaro v. Bee Sweet Citrus, Inc.*,
No. 121CV00382JLTHBK, 2022 WL 3908309
(E.D. Cal. Aug. 30, 2022) .............................................................. 42

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S. Ct. 1955 (2007) ........................................... 61

*Bradley v. Worthington Indus.*,
No. 2:18-CV-00486-BSJ, 2020 WL 2736022
(D. Utah May 26, 2020) ................................................................. 49

*Christian v. Mattel, Inc.*,
286 F.3d 1118 (9th Cir.2002) ........................................................ 70

*Christianburg Garment Co. v. EEOC*,
434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) .................... 39

*City of W. Sacramento, California v. R & L Bus. Mgmt.*,
No. 2:18-CV-900 WBS EFB, 2019 WL 2249630
(E.D. Cal. May 23, 2019) ............................................................... 53

*In re Clark Warren Baker*,
Adv. Case No. 2:15-AP-01535-BB ......................................... 32, 33

*Dragor Shipping Corp. v. Union Tank Car Co.*,
    378 F.2d 241 (9th Cir. 1967) .......................................................... 45

*Elettronica GmbH v. Radio Frequency Simulation Sys.,
    Inc.*,
    No. SACV1601523AGKESX, 2017 WL 6888258
    (C.D. Cal. Aug. 21, 2017) ............................................................. 69

*Ellis v. Salt River Project Agric. Improvement & Power
    Dist.*,
    24 F.4th 1262 (9th Cir. 2022)................................................... 58, 59

*FDI, Inc. v. W.R. Grace & Co., Inc.*,
    CV 75-1532 MML, 1980 WL 1996
    (C.D. Cal. Sept. 29, 1980) ............................................................ 48

*First Nat'l Bank of Arizona v. Kislak Nat'l Bank*,
    No. CV 05-2354-PHX-EHC, 2007 WL 9724236
    (D. Ariz. Feb. 15, 2007) ................................................................ 49

*In re Flannery*,
    No. 04-02865-B7, 2006 WL 6602237
    (Bankr. S.D. Cal. Sept. 13, 2006)................................................. 45

*Flinders v. Datasec Corp.*,
    742 F. Supp. 929 (E.D. Va. 1990)................................................. 41

*Grimmett v. Brown*, 75 F.3d 506 (9th Cir. 1996) ............................... 54

*Harara v. ConocoPhillips Co.*,
    No. C04-0515 BZ, 2005 WL 240773
    (N.D. Cal. Jan. 27, 2005)............................................................... 69

*Hewitt v. City of Stanton*, 798 F.2d 1230 (9th Cir. 1986) .................. 38

*Holgate v. Baldwin*, 425 F.3d 671 (9th Cir.2005) ........................ 40, 70

*Horisons Unlimited v. Santa Cruz-Monterey-Merced*
    *Managed Med. Care Comm'n*,
    No. 1:14-CV-00123-LJO-MJ, 2014 WL 3342565
    (E.D. Cal. July 2, 2014) .................................................................. 70

*Hudson vs. Moore Business Forms, Inc*. 836 F.2d 1156 at
    1160 (9th Cir. 1987) ...................................................................... 42

*Infra.*Part.III.D. *Clipper Exxpress v. Rocky Mountain*
    *Motor Tariff Bureau, Inc*., 690 F.2d 1240 (9th Cir.
    1982) .......................................................................................*passim*

*K.F. Jacobsen & Co. v. Gaylor*,
    No. 3:12-CV-2062-AC, 2014 WL 273140
    (D. Or. Jan. 23, 2014) .................................................................... 40

*Kelter v. Associated Financial Group, Inc*.,
    382 Fed. Appx. 632 (9th Cir. 2010) ............................................. 40

*Kottle v. Nw. Kidney Centers*,
    146 F.3d 1056 (9th Cir. 1998) ................................................. 64, 69

*Liberty Lake Inv., Inc. v. Magnuson*,
    12 F.3d 155 (9th Cir.1993) ............................................................ 64

*Lima v. Deutsche Bank Nat. Tr. Co*.,
    No. CIV. 12-00509 SOM, 2013 WL 5890662
    (D. Haw. Oct. 30, 2013), *aff'd sub nom. Lima v.*
    *Deutsche Bank Nat'l Tr. Co*., 687 F. App'x 606 (9th
    Cir. 2017) ........................................................................ 70, 71, 72

*Marshall v. Goguen*,
    No. CV 21-19-M-DWM, 2022 WL 1641776
    (D. Mont. May 24, 2022) ................................................................ 41

*Mattel, Inc v. MGA Entm't, Inc.*,
    705 F.3d 1108 (9th Cir. 2013) ...................................................... 44

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
    641 F.3d 834 (7th Cir. 2011) ..................................... 20, 60, 62, 63

*MGA Entm't, Inc. v. Mattel, Inc.*,
    2011 WL 5007955 ..................................................... 26, 45, 46, 48

*MGA Entm't, Inc.v. Mattel, Inc.*,
    No. CV 11-01063 DOC ........................................................ 26, 45

*Moore v. New York Cotton Exch.*,
    270 U.S. 593 (1926) ...................................................................... 44

*N. Tr. Co. v. Ralson Purina Co.*,
    No. 94 C 4045, 1994 WL 605743
    (N.D. Ill. Nov. 3, 1994) ........................................................ 36, 57

*Neo4j, Inc. v. PureThink, LLC*,
    No. 5:18-CV-07182-EJD, 2021 WL 810260
    (N.D. Cal. Mar. 3, 2021) ............................................................ 49

*Operating Engineers Pension Trust v. A-C Co.*,
    859 F.2d 1336 (9th Cir. 1985) ................................................. 18, 38

*Oplink Commc'ns, Inc. v. Finisar Corp.*,
    No. C-11-2361 EMC, 2011 WL 3607121
    (N.D. Cal. Aug. 16, 2011) .......................................................... 45

*Orange Cty. Health Care Agency v. Dodge*,
    793 F. Supp. 2d 1121 (C.D. Cal. 2011) ........................................ 55

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
    193 F.3d 781 (3d Cir.1999) ............................................................ 39

*Pace Indus., Inc. v. Three Phx. Co.*,
    813 F.2d 234 (9th Cir. 1987) ........................................... 57, 58, 59

*Padres Hacia Una Vida Mejor v. Jackson*,
    No. 1:11-CV-1094 AWI DLB, 2012 WL 6053946
    (E.D. Cal. Dec. 5, 2012) ................................................................ 40

*Park Assist, LLC v. San Diego Cty. Reg'l Airport Auth.*,
    No. 318CV02068BENMDD, 2020 WL 520900
    (S.D. Cal. Jan. 31, 2020) ............................................................... 38

*Philadelphia Indem. Ins. Co. v. Danco Builders*,
    No. 15-CV-03945-WHO, 2017 WL 24755
    (N.D. Cal. Jan. 3, 2017) ................................................................ 52

*Pochiro v. Prudential Ins. Co. of Am.*,
    827 F.2d 1246 (9th Cir. 1987) ................................................. 43, 44

*Remington Invs., Inc. v. Kadenacy*,
    930 F. Supp. 446 (C.D. Cal. 1996) ............................................... 42

*Sosa v. DIRECTV*, Inc., 437F.3d 923, 936 (9th Cir. 2006) ............... 60

*Swallow v. Torngren*,
    No. 17-CV-05261, 2018 WL 2197614 (N.D. Cal. May
    14, 2018), *aff'd*, 789 F. App'x 610 (9th Cir. 2020) .......... 67, 68, 69

*Syran v. LexisNexis Grp.*,
No. 05-CV-0909-LAB (JMA), 2005 WL 8149144
(S.D. Cal. Nov. 9, 2005) ................................................................ 70

*Szanto v. Szanto*,
No. 3:18-CV-951-SI, 2020 WL 7419215
(D. Or. Dec. 18, 2020) .................................................................... 55

*Tate-Robertson v. Walmart Inc.*,
No. EDCV1927JGBSHKX, 2019 WL 6454392
(C.D. Cal. Aug. 13, 2019) ............................................................. 50

*Thomas v. Hous. Auth. of Cnty. of Los Angeles*,
No. CV046970MMM(RCX), 2006 WL 5670938
(C.D. Cal. Feb. 28, 2006) .............................................................. 67

*UDAP Indus. v. Bushwacker Backpack & Supply Co.*,
2017 U.S. Dist. LEXIS 66803, 2017 WL 1653260
(D. Mont. May 2, 2017) .................................................................. 50

*Uniroyal Chem. Co. v. Syngenta Crop Prot., Inc.*,
No. 3:02CV02253 (AHN), 2005 WL 677806
(D. Conn. Mar. 23, 2005) .............................................................. 53

*United Nat. Ins. Co. v. R & D Latex Corp.*,
242 F.3d 1102 (9th Cir.2001) ....................................................... 71

*Verigy US, Inc. v. Mayder*,
No. C-07-04330 RMW, 2008 WL 4820755
(N.D. Cal. Nov. 4, 2008) ................................................................ 39

*Wagner v. Adickman*,
No. CV-19-03216-PHX-SMB, 2021 WL 199210
(D. Ariz. Jan. 20, 2021) ........................................................... 19, 42

*Walker-Cook v. Integrated Health Res., LLC*,
 No. CV 12-00146 ............................................................. 54

*Woodrum v. Woodward Cnty., Okl.*,
 866 F.2d 1121 (9th Cir. 1989) ....................................................... 38

**Statutes**

Rule 11 ............................................................................*passim*

Rule 13 ...................................................................... 34, 44

Rule 13(a) ...................................................... 43, 45, 46, 47

## I.  **INTRODUCTION**

This Appeal involves an unfortunate instance of counsel being sanctioned for protecting their client's rights.[1]  During the course of the underlying litigation, evidence emerged that the plaintiff appellee, Natural Immunogenics Corp. ("NIC"), had furthered its case through the commission of RICO predicates, including mail and wire fraud, witness tampering, extortion, suborning perjury, and impersonating a law enforcement officer.  The conduct uncovered went far beyond sharp practice.  NIC obtained sanctions and summary judgment through false statement to courts, including claiming its investigator was not acting on its directions.  Via that investigator, NIC had blackmailed a witness using a derogatory website.  It would later be established in other litigation that NIC's investigator's modus operandi was to "use[] 'adverse websites' to coerce witnesses" and he was referred by the presiding judge for witness tampering prosecution and criminal prosecution.  After that, NIC moved for "death penalty" issue sanctions by seeking to frame Appellants' client for felony perjury, ironically using knowingly false declarations ("False Perjury

---

[1] While Appellants firmly believed at all times that the Counterclaim was filed for a proper purpose and in accordance with existing Ninth Circuit precedent, they never intended to offend the District Court and have apologized to the District Court for doing so.  (2-ER-178).

Claim").

Around the same time – which was five years into the case and only nine months before trial – NIC sought leave to amend its complaint to add a completely new RICO scheme. In opposing, Appellants notified the district court that if "NTG is forced to file a response to a new, amended Complaint, prudence and the compulsory counter-claim rule require that NTG raise its counter-claims against NIC and those who have acted in concert with it." (*See* Excerpts of Record filed concurrently herewith ("EOR") at Vol. 5, Exh. 68, pg. 1107). After the District Court granted leave and NIC filed its Third Amended Complaint ("TAC"), NTG filed its Counterclaim, which it amended to clarify issues raised by NIC, and NIC *et al*. moved for sanctions against Appellants and NTG based on the First Amended Counterclaim ("FACC").

Rule 11 sanctions are "an extraordinary remedy" to be "exercised with extreme caution.'" *Operating Engineers Pension Trust v. A-C Co.*, 859 F.2d 1336, 1345 (9th Cir. 1985). They are reserved "for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose." *Operating Engineers Pension Trust v. A-C*

*Co.*, 859 F.2d 1336, 1344-45 (9th Cir. 1988). Here, the District Court's Order imposing sanctions, (1-ER-32-48 ("Order")) more resembles strict liability than an extraordinary remedy. In a case involving complex and unsettled legal issues, it dismissed the FACC based on Appellee's legal arguments that were either wrong or at best debatable and unsettled. Then, without requiring the mandatory showing that Appellants failed to undertake a "reasonable inquiry" and research the issues, it sanctioned Appellants. It did so based on arguments that "NTG should have sought leave from the Court to file its amended," (1-ER-41), that the claims were "time barred under RICO," (*id.* at 43), and that the allegations related to false declarations were barred by *Noerr-Pennington*.

At each step, the District Court erred on the substantive law, disregarded the conflicting, complex, or unsettled nature of the law and facts, and drew unwarranted inferences against NTG and Appellants. "[T]he circumstances in which amending a complaint gives the opposing party the right to amend its counterclaims is an unsettled and widely debated issue." *Wagner v. Adickman*, No. CV-19-03216-PHX-SMB, 2021 WL 199210, at *2 (D. Ariz. Jan. 20, 2021). Yet with no controlling authority, the District Court

19

sanctioned Appellants for taking a position that other district courts have accepted. *Infra.*Part.III.A. It found the RICO allegations – almost all of which related to and occurred during the pendency of NIC's claims – to be time barred by ignoring the longstanding rules tolling the statute on compulsory counterclaims. *Infra.*Part.III.B. Even though the FACC included alleged acts and injuries within the statutory period, the District Court disregarded them. *Infra.*Part.III.B. As to *Noerr-Pennington*, the District Court found a lack of reliance allegations even though the Counterclaim expressly alleged reliance. (5-ER-873, ¶¶ 143) (alleging that in February, 28, 2019, "the Court accepted the material misrepresentations . . . ."); 165. Moreover, a close reading of the fraud exception jurisprudence indicates that this Court has rejected a strict reliance requirement. *Infra.*Part.III.D. *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc*., 690 F.2d 1240, 1262 (9th Cir. 1982). Finally, the District Court's finding that a "cursory legal inquiry should have revealed" the issues, is unsustainable. These issues were closely researched and counsel are well-studied in them. *Mercatus Grp., LLC v. Lake Forest Hosp*., 641 F.3d 834, 847 (7th Cir. 2011) (citing Appellant Sabovich's 2008 law review article on the fraud exception to *Noerr-Pennington*).

Accordingly, the Order is erroneous and should be reversed.

## II.   PROCEDURAL HISTORY

NIC initiated this litigation on December 7, 2015.  (12-ER-2778-2851).  On January 25, 2016, NIC filed a First Amended Complaint.  (11-ER-2596-2597, ¶¶ 492, 494).  NIC's Second Amended Complaint alleged that the NTG Defendants perpetrated two litigation schemes: (1) the false-advertising scheme; and (2) the unauthorized recording, or "wiretapping" scheme.  *See generally* (11-ER-2376-2471).  But on February 14, 2020, with a looming trial date set to commence in less than nine months, NIC moved for leave to file an expanded Third Amended Complaint, adding new predicate acts and theories.  (6-ER-1109-1111).  Critically, when opposing NIC's Motion for Leave, Defendants notified the Court and NIC that if "NTG is forced to file a response to a new, amended Complaint, prudence and the compulsory counter-claim rule require that NTG raise its counter-claims against NIC and those who have acted in concert with it."  (5-ER-1107).

A.      **In Late 2019, NIC Seeks "Death Penalty" Sanctions Using**

**Declarations it Knew to be False**

On September 19, 2019, NIC had filed a Motion for Sanctions

against Scott Ferrell.  NIC alleged that Mr. Ferrell's July 3, 2019

Declaration, which explained that he learned of NIC's product from a

terminally ill family friend who lived with him including in December

2011 (Trycia Carlberg), was "false in every material respect."  (9-ER-

2042).  NIC demanded the most severe of sanctions, including a

"death penalty" type adverse inference instruction.  (4-ER-2047-

2050).  As proof of Mr. Ferrell's perjury, NIC represented that

"Trycia never resided or lived at the Ferrells' home in December

2011—a fact which undermines every material position in Ferrell's

declaration."  (9-ER-2036).  The express assertion that Trycia

Carlberg did not live with the Ferrells in 2011 appears at least 15

times in NIC's sanctions motion.  (9-ER-2035:10-12; 2036:19-22;

2037:10-13; 2038:10-13; 2038:16-18; 2038:24-25; 2039:1-2;

2039:23-26; 2040:3-4; 2040:12-14; 2042:8-12; 2044:7-9; 2045:1-2;

2045:7-9; 2045:19-21).  NIC's sanctions motion alleged that Scott

Ferrell's declaration made ten "materially false statements under

oath[.]"  (9-ER-2038-2040).  All but one of these accusations were

expressly predicated on NIC's "evidence" that Trycia was not living with the Ferrells in December 2011, as Scott Ferrell testified. (*Id.* at 2038-2039).

NIC's Motion was based entirely upon the sworn declarations of three witnesses: 1. Charlotte Carlberg (Trycia Carlberg's mother), 2. MaryAnn Buc (alleged friend), and 3. Jim Buc (alleged friend). In choreographed sworn statements, the three NIC witnesses all purported to testify based on personal knowledge that Scott Ferrell's testimony regarding Christmas Eve 2011 is "false" or "untrue" because Trycia was with her mother over Christmas in 2011. (9-ER-2074, ¶¶ 14, 9; 9-ER-2059, ¶¶ 4-6; 9-ER-2087, ¶ 8). All declarants unequivocally accuse Scott Ferrell of perjury on this point. (9-ER-2059-2060 ¶¶ 6-7; 9-ER-2074, ¶ 9; 9-ER-2087, ¶ 8). NIC used the three declarations to falsely accuse Scott Ferrell of multiple felonies, including perjury, criminal obstruction of justice, and fraud on the court. (9-ER-2052).

The allegations and testimony were completely false. Overwhelming and undisputable photographic and documentary evidence confirms that Trycia Carlberg did live with the Ferrells in December 2011 and was with them Christmas Eve, exactly as Scott

Ferrell had previously testified. (8-ER-1831-1836). Public Facebook posts, YouTube videos, cards, messages, and emails showed that Trycia was in the Ferrells' home from late 2011 until shortly before her death in May 2012. *Id.*

The evidence available to Appellants strongly suggested a deliberate fraud by NIC and the declarants. The false statements were not minutia, but rather concerned a major life event – the passing of a daughter (or close friend) and where she lived out her last six months of terminal illness. It strains credulity that a mother would innocently forget that a family (the Ferrells) took in her daughter for the last six months of her daughter's life. Moreover, all three witnesses offered the same false testimony on multiple related issues regarding Trycia Carlberg and the Ferrells. (*See generally* 8-ER-1792). Even more suspicious, NIC had taken deliberate measures to insulate the three witnesses from any scrutiny. NIC took the highly unusual and inappropriate step of threatening to bring "witness tampering" charges if NTG contacted the declarants. (9-ER-1929). NIC followed this with an anomalous request for an order that NTG be precluded from cross-examining the declarants because they were "experiencing the emotional trauma . . . ." (9-ER-2049). Given these circumstances and

the lack of any plausible explanation by NIC, NTG sought an order to show cause regarding potential sanctions and leave to take written discovery into the origins of the false declarations. (7-ER-1406-1424). While the District Court denied an order to show cause regarding sanctions, it granted discovery. In so doing, it held on February 7, 2020, that Ferrell has "a right to sue a party who he believes has committed perjury . . . against him, so long as it is not done without merit and for the sole purpose of harassing or influencing the witness," and that "Ferrell had grounds to believe that the declarations contained inaccuracies, and cannot be deprived of his right to file a lawsuit when he believes he has been wronged." (9-ER-1421).

The produced communications between NIC and the declarants raised serious concerns. It turns out that NIC's counsel knew, contrary to what NIC would tell the Court, that Trycia Carlberg was living with the Ferrells in 2011, including in December 2011. Trycia Carlberg's mother directly told NIC's counsel that before the sanctions motion was filed that Tyrcia's Facebook had pictures "of her at their [the Ferrells'] house during Nov, Dec, Feb and March." (7-ER-1488). Documents similarly indicated that NIC made promises

to the declarants in exchange for testimony.  (5-ER-850-853, ¶¶ 71-80; 878, ¶ 170).

**B.**     **NIC Files an Amended Complaint, Requiring Appellants to Assert Their Client's Compulsory Counterclaim**

One week after the District Court had indicated that Appellants' client had grounds to believe false declarations had been filed and had affirmed that he had "a right to sue a party who he believes has committed perjury . . . against him," (7-ER-1421), NIC moved to amend its operative Complaint to add a completely new RICO enterprise and a new cause of action.  That, in turn, created a compulsory counterclaim issue that Appellants were professionally obligated to address.

All the misconduct related to allegations in the Complaint, (3-ER-464-465), had occurred between the filing of a Complaint and the final amendment to it.  Research shows that at least one court in the Central District had found "litigation misconduct" type claims to be compulsory when the claims arose between the initial and final amended Complaint in the underlying litigation.  *MGA Entm't, Inc.v. Mattel, Inc.*, No. CV 11-01063 DOC RNBX, 2011 WL 5007955, at *5 (C.D. Cal. Oct. 20, 2011).  Accordingly, Appellants notified the Court

and NIC that if "NTG is forced to file a response to a new, amended Complaint, prudence and the compulsory counterclaim rule require that NTG raise its counterclaims against NIC and those who have acted in concert with it." (5-ER-1107).

NIC pressed forward with its Motion for Leave and thereafter filed its Third Amended Complaint ("TAC") on March 24, 2020, (5-ER-957-1064), which necessarily prompted Counterclaimants to file their Counterclaim for RICO and RICO Conspiracy on April 7, 2020. The TAC added a third alleged "scheme," one which NIC separately defined as the "Lanham Act scheme." (5-ER-965, ¶ 25; 969-970, ¶¶ 40-45). Importantly, NIC's new "Lanham Act scheme" alleged something new and different from the false advertising and wiretapping "schemes" alleged in its Second Amended Complaint. (5-ER-965, ¶ 25; 969-970, ¶¶ 40-45; 1032-1035, ¶¶ 359-377). NIC's newly alleged Lanham Act scheme so changed NIC's RICO theory that it did not fit within NIC's definition of the RICO enterprise.

In this regard, the previously operative Second Amended Complaint and NIC's first attempted Third Amended Complaint both alleged, "Defendants in this action comprise an associated-in-fact enterprise which maintains a 'hub-and-spoke' structure," by which

"NTG, through its attorneys, employees and agents" operated "at the center of the enterprise" and the alleged "sham plaintiffs . . . operate as the spokes." (11-ER-2462-2463, ¶ 378; 5-ER-1054-1055, ¶ 438. NIC further described the operation of the "enterprise" as follows: "The hub identifies potential victim corporations and acquires a sham plaintiff" and "the sham plaintiff then engages in whatever conduct and provides whatever testimony is necessary to maintain the pressure of facially valid litigation . . . ." *Id.* Accordingly, NIC has sued the alleged "sham plaintiffs" and claimed that "[t]he plaintiffs-for-hire are indispensable to the enterprise because . . . the sham lawsuits cannot be filed or pursued without a bribed plaintiff willing to support those actions as the 'plaintiff' partnered with NTG." (11-ER-2463, ¶ 379; 5-ER-1055, ¶ 439).

The TAC changed this. The case had been litigated for almost five years based on an alleged "hub and spoke" enterprise allegedly using sham plaintiffs. (11-ER-2463, ¶ 379; 5-ER-1055, ¶ 439). The TAC added a new and essentially unrelated scheme alleging that a health products company brought frivolous Lanham Act false advertising claims against competitors. (5-ER-965, ¶ 25; 969-970, ¶¶ 40-45; 1032-1035, ¶¶ 359-377). NIC's new Lanham Act scheme,

however, did not fit within the enterprise as defined by NIC. There was no "hub" allegedly recruiting "sham" plaintiffs and there was no allegation of bribery or "plaintiffs-for-hire," which NIC had consistently claimed was indispensable to the RICO enterprise. (11-ER-2462-2463, ¶¶ 378-379). In fact, NIC did not even explain how the new Lanham Act scheme was related to or part of any RICO enterprise as defined and alleged by NIC. (5-ER-1054-1056, ¶¶ 436-443). Thus, the District Court initially dismissed the TAC precisely because NIC's new Lanham Act scheme no longer fit within the "enterprise" that NIC had alleged. Specifically, this Court held:

> Nonetheless, NIC's own definition of enterprise does not include the Lanham Act scheme structure because it focuses entirely on sham plaintiffs engaged through bribery. (*See* id. 1054-1054, ¶¶ 438-39). While NIC argues in its brief that this fits into the hub-and-spoke structure, given that the "enterprise" as defined in the complaint does not include allegations that the Lanham Act scheme was part of the enterprise, it is difficult to find that the new Lanham Act allegations fall within the same enterprise as the other two schemes.

(5-ER-820).

## C.    **The Counterclaim Allegations**

Despite this clear and advanced warning, NIC pressed forward with its Motion for Leave and thereafter filed its TAC on March 24, 2020. (5-ER-957-1064). This necessarily prompted Counterclaimants to file their Counterclaim for RICO and RICO Conspiracy on April 7, 2020, followed by the filing of the currently operative FACC on May 8, 2020. (5-ER-892-956; 824-891). The FACC alleges one count of Violation of RICO Act and one count of Conspiracy to Violate RICO Act against NIC and its co-presidents, Emord & Associates and Arhangelsky, as well as against Charlotte Carlberg, Jim Buc, and MaryAnn Buc (the "Declarants"). (5-ER-824-891).

The FACC was based on four different but related schemes by NIC and its co-conspirators, which are described in great detail and involve multiple predicate acts by each of the Counter-Defendants. (*id.* 833, ¶ 36). The first was the recent events by which "NIC ha[d] sought to effectively 'win' this lawsuit through the solicitation and submission of perjured testimony" in an effort to frame Ferrell for multiple felonies. (*Id.* 838, ¶ 48). The FACC also provides over 21

pages of factual detail on how NIC promised benefits to and manipulated witnesses who held "grudges" against Ferrell so they would be enticed to offer testimony accusing him of perjury, even though NIC and the witnesses knew the testimony was false. (*Id.* 838-859, ¶¶ 48-94). It was alleged that NIC then sought dispositive issue sanctions based on that knowingly false testimony. (*Id.* 841-850, ¶¶ 57-70). And "[a]fter being caught red-handed with their lies, NIC, the Emord Firm, and Arhangelsky then proceeded to double down and file even more false statements and declarations before this Court . . ." (*Id.* 853-857, ¶¶ 81-89).[2]

Second, the FACC alleges that NIC and others engaged in an elaborate scheme to blackmail a false confession from a former NTG client through the use of a derogatory website and then to cover up their actions. (*Id.* 859-874, ¶¶ 95-149). NIC employed the services of a known extortionist, Clark Baker. "Baker has a history of deploying derogatory and defamatory websites for extortion, so much so that

---

[2] The FACC also notes how these knowingly false declarations and fraudulent filings in late 2019 meet the continuity requirement for the RICO claims, which is why those claims just recently accrued and are timely. (5-ER-838-858, ¶¶ 48-91; 887, ¶210) [describing the "most recent unlawful scheme" and how it satisfies the RICO element of continuity].

there is an adverse inference in the matter of *In re Clark Warren Baker*, Adv. Case No. 2:15-AP-01535-BB (the "Murtagh v. Baker Action"), prohibiting Baker from contesting "Baker's scienter and purpose that Baker uses 'adverse websites' to coerce witnesses." (5-ER-862, ¶ 105). The FACC explains in great factual detail how certain Counter-Defendants established a derogatory website against Andrew Nilon ("Nilon") to blackmail him, engaged in an elaborate deception campaign with Baker defrauding Nilon and impersonating others, and "told Nilon that the Website would be put back up if Nilon did not cooperate with him, but it would stay down if Nilon told him what he wanted to hear about," as well as the degree to which the involved Counter-Defendants have attempted to cover up these actions. (5-ER-859-874, ¶¶ 95-149). Indeed, NIC fraudulently obtained summary adjudication on NTG's unclean hands defense by falsely telling this Court that "Baker did not act at NIC's direction," a claim that has since been proven false. (*Id.* 873, ¶ 143).

Third, the FACC alleges additional attempted extortion of NTG's former clients via phone calls from Baker. (5-ER-873-876, ¶¶ 144-162). Baker contacted multiple former NTG clients, falsely claiming to be a law enforcement officer, threatening that "the NTG

clients with whom Baker was speaking would be going to prison as well if they did not 'come clean' and admit to having engaged in numerous crimes." (*Id.* 874, ¶ 145). "Baker was reporting back to the Emord Firm and to NIC via numerous email messages about his communications with witnesses in the instant action whereby he had threatened, extorted/blackmailed/impersonated an officer to" NTG's former clients. (*Id.* 876, ¶ 161).

And fourth, in the *Nilon* Action, NIC's former counsel obtained sanctions by filing a false declaration representing that a deposition had been noticed when it had not. (*Id.* 876-877, ¶¶ 163-166). All schemes were alleged to be part of an "ongoing" enterprise, (*id.* 825, ¶ 3; 833, ¶ 36; 878, ¶ 171), and pose a threat of continued criminal conduct, (*id.* 887, ¶¶ 210-11).

**D.     The District Court Erroneously Grants Rule 11 Sanctions against Appellants**

On August 3, 2020, the District Court granted the Motion to Strike, and Motion for Sanctions in full. (1-ER-32). The order began by noting that the "TAC alleges that the NTG Defendants perpetrated three litigation schemes," (*id.* at 33), which is significant because the order issued under the Second Amended Complaint noted allegations

of "two litigation schemes," (7-ER-1407).

Against this backdrop of NIC having amended its Complaint to add a new "litigation scheme," the Order first evaluated NIC's argument that the Counterclaim should be struck "filed out of time, shortly prior to trial and without leave of court in violation with the Scheduling Order." (1-ER-39). The District Court agreed that compliance with the Scheduling Order or leave would only be required if the Counterclaim "was not compulsory," (1-ER-39), but then did not evaluate whether the Counterclaim was compulsory under Rule 13, *id.* Instead, the Order proceeded with whether leave was required – which is completely separate from whether the Counterclaim was compulsory and necessarily presumes it was not. (1-ER-39).

As to whether leave is required, the District Court stated it "adopts" the moderate approach and recited that rule as "'newly alleged counterclaims are allowed as of right only to the extent they directly relate to changes in the amended complaint.'" (1-ER-40) *quoting Tate-Robertson v. Walmart Inc.*, No. EDCV1927JGBSHKX, 2019 WL 6454392, at *2 (C.D. Cal. Aug. 13, 2019). Because NIC had advanced the above quoted language as reciting the "moderate

approach" in briefing, (4-ER-769), NTG had pointed out that the language "is not a correct statement of the law" and provided a detailed analysis of the case law. (3-ER-468). The Order went on to apply this "test," finding that "the Amended Counterclaim does not focus at all on the changes to the TAC or even address them." (1-ER-40). The Order did not address that the TAC had added a new alleged and largely unrelated RICO "scheme" and fundamentally changed the enterprise. *Id.* Instead, it seemly disregarded the new allegations as "predicate acts that had continuously been discussed and discovery for which was litigated throughout this action by the parties." (1-ER-40). Lastly, the Order found that the FACC was beyond the "breadth of the changes" made by the TAC because the FACC "adds an entirely new RICO scheme." (1-ER-40).

The Order next found the FACC to be time barred by RICO's four-year statute of limitations. (1-ER-43). The Order acknowledged that on their face, some of the claims were not "outside of the statute of limitations." (1-ER-43). After all, the FACC included extensive allegations of misconduct and "injuries to their business and reputation" occurring in 2017, 2018, 2019, and 2020. (5-ER-868-869, ¶ 124; 877, ¶ 166; 878, ¶ 171; 886-887, ¶¶ 209-210; 888, ¶ 217; *see*

*also* 873, ¶ 143) (alleging that "[t]his injury occurred on February 28, 2019, when the Court issued its order at Docket 784."). However, the Order adopted NIC's reply brief argument that NTG's "only injury is legal fees in defending against NIC's RICO suit" and "litigation expenses incurred after an overt act do not extend the statute of limitations." (1-ER-44) *quoting See N. Tr. Co. v. Ralson Purina Co*., No. 94 C 4045, 1994 WL 605743, at *8 (N.D. Ill. Nov. 3, 1994). Under this theory, "NTG's RICO counterclaims accrued in December 2015, when NTG suffered its alleged RICO injury: attorney fees in this case." 2-ER-253; *cf.* 5-ER-858, ¶ 92 (alleging that "Counterclaimants' first injuries from the acts alleged in paragraphs 48 to 90 occurred in approximately August of 2019 in the form of legal fees and costs, investigative fees, damage to reputation, and fees and costs of responding to NIC's false allegations."); 5-ER-872, ¶ 143 (alleging "injury occurred on February 28, 2019, when the Court" entered summary adjudication against NTG).

Regarding *Noerr-Pennington*, the FACC included allegations that the alleged misconduct and misrepresentation was "so serious as to deprive the litigation of its legitimacy." (5-ER-858-859, ¶ 93; 877, ¶ 165). While admitting that "the Ninth Circuit has not defined what

is a misrepresentation that 'deprives the litigation of its legitimacy,'"
(1-ER-36), the District Court nonetheless required a showing that the
misrepresentations had been "relied on" by the court.  (1-ER-46).
NTG did expressly allege court reliance, (5-ER-877, ¶ 166; 888, ¶
216) ("On February 28, 2019, Counterclaimants were injured by
having summary adjudication entered against them based on NIC's
false representation that Baker was not acting as NIC's agent.")  And
it cited the District Court to Ninth Circuit authority rejecting a strict
reliance requirement.  (3-ER-326-327).  These issues were not
addressed in the Order.  *See generally* (1-ER-32-48).

Finally, as NTG pointed out in opposition, there was no
showing at all that Appellants conducted an inadequate inquiry.  (3-
ER-485-515) (NIC's sanctions motion containing no evidence or
argument on adequacy of inquiry); (3-ER-323-324).  The Order
nonetheless found that a "cursory legal inquiry should have revealed
these deficiencies" and thus that "NTG, Ferrell and their attorneys did
not conduct a reasonable and competent inquiry . . . ."  (1-ER-47).

## III.   THE ORDER IS ERRONEOUS AND MUST BE RESERVED

Where, as here, the imposition of sanctions is based on

conclusion of law, this Court reviews it *de novo*. *Hewitt v. City of Stanton*, 798 F.2d 1230, 1232 (9th Cir. 1986) ("We review de novo the district court's imposition of Rule 11 sanctions based upon the legal conclusion that the facts constitute a Rule 11 violation."); *Woodrum v. Woodward Cnty., Okl*., 866 F.2d 1121, 1127 (9th Cir. 1989) ("whether specific conduct violated Rule 11 is a legal issue reviewable de novo").

As to the sanctions inquiry, this Court "has made clear that 'Rule 11 is an extraordinary remedy, one to be exercised with extreme caution.'" *Park Assist, LLC v. San Diego Cty. Reg'l Airport Auth.*, No. 318CV02068BENMDD, 2020 WL 520900, at *1 (S.D. Cal. Jan. 31, 2020) (quoting *Operating Engineers Pension Trust v. A-C Co.*, 859 F.2d 1336, 1345 (9th Cir. 1985)). Importantly, "Rule 11 must not be construed so as to conflict with the primary duty of an attorney to represent his or her client zealously.*" Operating Engineers Pension Tr. v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988). As the Ninth Circuit recognizes, "[f]orceful representation often requires that an attorney attempt to read a case or an agreement in an innovative though sensible way." *Operating Engineers Pension Tr. v. A-C Co*., 859 F.2d 1336, 1344 (9th Cir. 1988). Since the "law is constantly

evolving, and effective representation sometimes compels attorneys to take the lead in that evolution . . . .Rule 11 must not be turned into a bar to legal progress." *Id*. Caution is further warranted given that "[s]anctions can have an unintended detrimental impact on an attorney's career and personal well-being." *Verigy US, Inc. v. Mayder*, No. C-07-04330 RMW, 2008 WL 4820755, at *10 (N.D. Cal. Nov. 4, 2008). Moreover, "[i]t is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims . . . ." *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 421-22, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). Such "[r]estraint [in imposing sanctions] is particularly important where ... the case presents complex factual and legal issues." *In re Orthopedic Bone Screw Prods. Liab. Litig*., 193 F.3d 781, 796 (3d Cir.1999).

Here, the Rule 11 Motion was directed at a Counterclaim. In those circumstances, the Court "'must conduct a two-prong inquiry to determine (1) whether the complaint is legally or factually baseless from an objective perspective, and (2) if the attorney has conducted a

reasonable and competent inquiry before signing and filing it.'"

*Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir.2005) (quoting

*Christian v. Mattel, Inc*., 286 F.3d 1118, 1127 (9th Cir.2002)); *Kelter*

*v. Associated Financial Group, Inc*., 382 Fed. Appx. 632, 633 (9th

Cir. 2010) (same). Put differently, a finding that a Complaint is

"frivolous" is appropriate only if it "is both baseless and made without

a reasonable and competent inquiry." *Holgate*, 425 F.3d at 676

(quoting *Moore v. Keegan Mgmt. Co (In re Keegan Mgmt. Co., Sec.*

*Litig.)*, 78 F.3d 431, 434 (9th Cir.1996)). "The reasonableness

standard governing a Rule 11 inquiry is objective." *Kelter*, 382 Fed.

Appx. at 633 (citing *G.C. and K.B. Investments, Inc. v. Wilson*, 326

F.3d 1096, 1109 (9th Cir.2003)). "[I]f the complaint 'states an

arguable claim,' sanctions are generally inappropriate." *K.F.*

*Jacobsen & Co. v. Gaylor*, No. 3:12-CV-2062-AC, 2014 WL 273140,

at *3 (D. Or. Jan. 23, 2014) (quoting *Stewart v. American Int'l Oil &*

*Gas Co.,* 845 F.2d 196, 201 (9th Cir.1988)). In other words, "[a]s

long as there is some 'plausible basis,' even a weak one, for the

arguments advanced, then Rule 11 sanctions are improper." *Padres*

*Hacia Una Vida Mejor v. Jackson*, No. 1:11-CV-1094 AWI DLB,

2012 WL 6053946, at *1 (E.D. Cal. Dec. 5, 2012). The Counterclaim

alleged RICO, which is a notoriously complex and difficult area of law. *3BA Int'l LLC v. Lubahn*, No. C10-829RAJ, 2012 WL 2317563, at *7 (W.D. Wash. June 18, 2012) ("A civil RICO claim is among the most complicated of federal statutory claims."); *Marshall v. Goguen*, No. CV 21-19-M-DWM, 2022 WL 1641776, at *5 (D. Mont. May 24, 2022) (noting "the inherent complexity of civil RICO actions."); *Flinders v. Datasec Corp*., 742 F. Supp. 929, 936 n.12 (E.D. Va. 1990) ("It is a rare civil RICO case that does not raise a number of difficult questions the terms of the statute do little to answer.").

## A.   <u>The District Court Erred Because Reasonable Investigation Demonstrated that Leave Was Not Required to Bring a Compulsory Counterclaim</u>

The District Court erred in finding that leave was required to file the Counterclaim, rendering it "time-barred under the Court's scheduling order," which it listed as an express basis for Rule 11 sanctions.  (1-ER-47).  The law on this area is admittedly unsettled without controlling authority, Appellants' position was based on a reasonable and good faith analysis of the case law addressing: (1) when leave is required to file a counterclaim in response to complaint amendment and (2) when a counterclaims is compulsory.

As one district court recently noted, "the circumstances in which amending a complaint gives the opposing party the right to amend its counterclaims is an unsettled and widely debated issue." *Wagner v. Adickman*, No. CV-19-03216-PHX-SMB, 2021 WL 199210, at *2 (D. Ariz. Jan. 20, 2021). Since "the Ninth Circuit has declined to rule on the issue," *id.*, there is no controlling authority. This alone renders it an inappropriate subject for sanctions. Even if Appellants' position was contrary to district court opinions, a holding "issued by another district court . . . had no binding effect on [NTG] at the time they filed the [FACC]." *Amaro v. Bee Sweet Citrus, Inc*., No. 121CV00382JLTHBK, 2022 WL 3908309, at *4 (E.D. Cal. Aug. 30, 2022). A "legal claim for which no mandatory authority exists does not present good grounds for sanctions because the law of the jurisdiction is unsettled." *Remington Invs., Inc. v. Kadenacy*, 930 F. Supp. 446, 451 (C.D. Cal. 1996). This Court has cautioned against sanctions in "an area of law which cannot be regarded as settled." *Hudson vs. Moore Business Forms, Inc*. 836 F.2d 1156 at 1160 (9th Cir. 1987).

Here, a diligent and fair reading of the case law showed that leave was not required for two separate and independent reasons.

First, it was likely that the Counterclaim was compulsory and Appellants were required to present it with their Answer to NIC's amended Complaint. Second, even if the Counterclaim was not compulsory, leave was probably not required to file it. District Courts in the Ninth Circuit favored the "moderate" approach but had, in at least one instance, followed the "permissive" approach. If the District Court applied the "moderate" approach, there was a reasonable probability that NTG would prevail, while if the "permissive" approach were adopted, it certainly would.

## 1. The Counterclaim Was Compulsory

Compulsory counterclaims are governed by Rule 13(a), which states, "[a] pleading must state as a counterclaim any claim that--at the time of its service--the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. Proc. 13(a). As noted by the Ninth Circuit, the Supreme Court has "admonished the courts that the 'transaction or occurrence' standard [is] to be read broadly." *Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1252 (9th Cir. 1987) (citing *Moore v.*

*New York Cotton Exch.*, 270 U.S. 593, 610 (1926)).  Whether two claims arise out of the same "transaction or occurrence" may not depend so much on "the immediateness of their connection" as it does on "their logical relationship." *Moore*, 270 U.S. at 610.

A logical relationship exists "when the counterclaim arises from the same aggregate set of operative facts as the initial claim, in that the same operative facts serve as the basis of both claims or the aggregate core of facts upon which the claim rests activates additional legal rights otherwise dormant in the defendant."  *Mattel, Inc v. MGA Entm't, Inc.*, 705 F.3d 1108, 1110 (9th Cir. 2013) (quoting *In re Pegasus Gold Corp.*, 394 F.3d 1189, 1196 (9th Cir. 2005).)  "This flexible approach to Rule 13 problems attempts to analyze whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit."  *Pochiro*, 827 F.2d at 1249.  Put differently, "[t]he phrase 'logical relationship' is given meaning by the purpose of the rule which it was designed to implement.  Thus, a counterclaim is logically related to the opposing party's claim when separate trials on each of their respective claims would involve a substantial duplication of effort and time by the parties and the

courts." *In re Flannery*, No. 04-02865-B7, 2006 WL 6602237, at *3 (Bankr. S.D. Cal. Sept. 13, 2006) quoting *Great Lakes Rubber Corp. v. Herbert Cooper Co.*, 286 F.2d 631, 634 (3rd Cir. 1961).

The penalty for failing to plead a compulsory counterclaim is severe. "Under Rule 13(a) a party who fails to plead a compulsory claim against an opposing party is held to have waived such claim and is precluded by res judicata from bringing suit upon it again." *Dragor Shipping Corp. v. Union Tank Car Co.*, 378 F.2d 241, 244 (9th Cir. 1967); *Oplink Commc'ns, Inc. v. Finisar Corp.*, No. C-11-2361 EMC, 2011 WL 3607121, at *2 (N.D. Cal. Aug. 16, 2011) ("[A] party that does not assert its compulsory counterclaim in the first proceeding has waived its right to bring the counterclaim and is forever barred from asserting that claim in future litigation.").

Counsel had every reason to view the Counterclaim as compulsory. As Appellants pointed out to the District Court, courts have even found "litigation misconduct" type claims to be compulsory when the claims arose between the initial and final amended Complaint. Notably, in *MGA Entm't, Inc. v. Mattel, Inc.*, No. CV 11-01063 DOC RNBX, 2011 WL 5007955, at *10 (C.D. Cal. Oct. 20, 2011), Judge Carter from this same District Court found that an

"abuse of process claim" relating to conduct in prior litigation was barred as an unpled compulsory counterclaim. *Id.* There, the Court found that "[b]ecause both MGA's current claim and Mattel's prior claim arise from the parties' conduct in the prior litigation, MGA's current claim was compulsory and should have been brought in the prior litigation." *Id.* at * 12.

As that district court made clear, the "same transaction" test applies to the "last pleadings" in the action. *Id.* at *11. Thus, the Rule 13(a) inquiry was whether NTG's claims "arose from the same transaction as [NIC's] last pleadings," which was the Third Amended Complaint, and whether the claim "existed when [NTG] filed its last pleadings," which would have been its Answer to the Third Amended Complaint. The likely answer to both was yes. The subject matter – alleged litigation misconduct – is the same, as are the RICO causes of action. *Compare* 5-ER-824-891 *with* 5-ER-957-1064. The predicate acts alleged in the Counterclaim all occurred in or leading up to the prosecution of NIC's claims in this action. *See generally* 5-ER-824-891. The schemes alleged in the Counterclaim also directly correspond to allegations in NIC's TAC. *Compare* 5-ER-972, ¶¶ 58-59 *with* 5-ER-838-859, ¶¶ 48-93 (allegations regarding whether

Ferrell had a client when sending a demand letter to NIC); *Compare* 5-ER-960-961, ¶ 8 *with* 5-ER-868-869, ¶¶ 123-127 (allegations regarding alleged confession by Andrew Nilon and extortion of him to obtain false confession); *compare* 5-ER-978-979, ¶¶ 94-96 *with* 5-ER-876, ¶¶ 163-164 (allegations regarding alleged failure to appear for deposition and of false attorney declaration regarding deposition notice).

The District Court adopted two arguments by NIC, neither of which have merit. First, the District Court concedes that "NTG lists specific ways in which the Amended Counterclaim allegedly corresponds to allegations in the TAC" but waves away the issue because "none of these allegations in the TAC are new with the exception of a portion of paragraph 95 . . . ." 1-ER-39. Respectfully, the District Court is confusing the leave requirement analysis with the Rule 13(a) inquiry. Neither the District Court nor NIC identified any support of the proposition that the "same transaction" test applies only to new allegations in an amended complaint and not the repeated prior allegations. Appellants are aware of none, and it would be irresponsible for any reasonable attorney to risk a client's claim by presuming such a limitation.

The Order uncritically adopted NIC's reply argument that "a claim acquired after service of an answer does not qualify as a compulsory cross-complaint or counterclaim." *Compare* 1-ER-41 *with* 2-ER-292. But in this case, that only begs the question of which "answer." As seen above, the district court in *MGA Entm't, Inc. v. Mattel, Inc.*, 2011 WL 5007955 at *11 looked to whether the claim existed as of "last pleadings" in the action. Likewise, *FDI, Inc. v. W.R. Grace & Co., Inc.*, CV 75-1532 MML, 1980 WL 1996, *4 (C.D. Cal. Sept. 29, 1980) found a claim to be non-compulsory when it "had not fully matured at the time [the asserting party] filed the amended answer in the prior case." Again, this "last pleading" was NTG's Answer to the TAC, and its claim had matured by the time it was due.

**2.** **The Counterclaim Satisfied the "Moderate" Approach Because NIC's Amended Complaint Added a New Theory and Changed the RICO Enterprise**

Even if the Counterclaim was not compulsory, the circumstances probably satisfied the "moderate" approach and thus would not require leave. The "moderate approach," which is followed most often by district courts in the Ninth Circuit, "permits the defendant to respond to an amended complaint that changes the theory

or scope of the case by adding counterclaims that similarly change the theory or scope of the case." *Adobe Sys. Inc. v. Coffee Cup Partners, Inc.*, 2012 WL 3877783, at *5; *First Nat'l Bank of Arizona v. Kislak Nat'l Bank*, No. CV 05-2354-PHX-EHC, 2007 WL 9724236, at *2 (D. Ariz. Feb. 15, 2007) ("The 'moderate approach' allows defendants to plead anew to an amended complaint that changes the theory or scope of the case."); *Bradley v. Worthington Indus.*, No. 2:18-CV-00486-BSJ, 2020 WL 2736022, at *1 (D. Utah May 26, 2020).

Here, there was at least a good faith argument that the TAC changed the "theory or scope" of the case.  As seen above, the TAC added a completely new RICO scheme.  *Supra*.Part.II.B.  In fact, the District Court dismissed the TAC precisely because NIC's allegations regarding its new alleged "Lanham Act scheme" did not fit within NIC's previously alleged RICO enterprise.  5-ER-820; *Cf. Neo4j, Inc. v. PureThink, LLC*, No. 5:18-CV-07182-EJD, 2021 WL 810260, at *2 (N.D. Cal. Mar. 3, 2021) (granting motion to strike when "[t]he parties in this case stipulated to the fact that the TAC did not change the theory or scope of the case."  At the time of the Order, it was the established law of this case that NIC materially changed its theory when it amended its pleading in the TAC.  It is also clear that NIC's

new "Lanham Act scheme" does not fit within the "hub-and-spoke"

and "plaintiffs-for-hire" structure that has been the hallmark of the

purported RICO "enterprise" upon which NIC has been litigating this

case for nearly four years. Indeed, an essential predicate act that

appears throughout NIC's description of the "hub-and-spoke"

enterprise is the alleged bribery of a plaintiff and class representative

to further the purported racket. This description and these factors do

not exist with the "Lanham Act scheme." For this reason alone, even

if the Counterclaim was not compulsory, which it is, NTG was not

required to seek leave before filing it.

    The Order avoids this through three cascading errors. First,

NIC represented, and the District Court accepted, that the "moderate"

approach required a showing that counterclaim allegations "directly

relate to changes in the amended complaint." *Compare* 4-ER-769

*with* 1-ER-39-40 (same quotation and citation to *Tate-Robertson v.*

*Walmart Inc.*, No. EDCV1927JGBSHKX, 2019 WL 6454392, at *2

(C.D. Cal. Aug. 13, 2019) for "moderate" approach.) That is the

"narrow" approach, not the moderate approach. *UDAP Indus. v.*

*Bushwacker Backpack & Supply Co*., 2017 U.S. Dist. LEXIS 66803,

at *8-10, 2017 WL 1653260 (D. Mont. May 2, 2017) ("Under the

narrow approach, counterclaims as of right are permissible 'only if they directly relate to the changes in the amended complaint.'"). NTG detailed the inaccuracy to the District Court in two separate briefs, 3-ER-468-469 and 2-ER-237, but was ignored. The District Court then applied the "narrow" approach, faulting Appellants for not having "focus at all on the changes to the TAC or even address them." (1-ER-40). The only time the Order references the actual "moderate" approach is when discussing whether the Counterclaim was "compulsory," 1-ER-40, which is a separate and legally distinct issue.

Second, while the Order does not dispute that the TAC added a new scheme or fundamentally altered the RICO enterprise, it found the addition immaterial because issues relating to Strataluz "continuously been discussed" and subject to discovery litigation. (1-ER-40). Respectfully, the fact that NIC sought and the District Court permitted discovery into the conduct of a health products company not referenced in NIC's Complaint is not the issue. The question is whether NIC altered the theory of the case presented in the Second Amended Complaint with the Third Amended Complaint. It unquestionably did since it added a new scheme in a way that the District Court recognized fundamentally changed the alleged RICO

Enterprise. Even if discovery litigation was relevant to the inquiry, which it is not, NIC had specifically represented that it was taking the discovery to support existing allegations, not to support new ones. (10-ER-2185). When NIC sought leave to take Strataluz discovery, it responded to NTG's concerns that "NIC seeks to drastically change and expand its allegations shortly before trial" by representing, "NIC's request will not modify any of the allegations in the SAC or the core issues for trial. Instead, NIC seeks leave to obtain discovery relevant to the pending allegations. . . . . The Strataluz evidence does not expand the existing allegations but, rather, supports and provides explanatory details concerning those allegations." *See also Philadelphia Indem. Ins. Co. v. Danco Builders*, No. 15-CV-03945-WHO, 2017 WL 24755, at *3 (N.D. Cal. Jan. 3, 2017) ("Danco had no obligation to prepare a defense for a possible, but unalleged, draft stop theory.").

Third and finally, the District Court found that the FACC was beyond the "breadth of the changes" made by the TAC because the TAC added to "an already existing RICO claim" whereas the FACC "adds an entirely new RICO scheme." (1-ER-40). But the TAC literally did add "an entirely new RICO scheme." *Supra*.Part.II.B.

The District Court's own orders reflect the addition of "the Lanham Act scheme." *Id.*; *see also Uniroyal Chem. Co. v. Syngenta Crop Prot., Inc.*, No. 3:02CV02253 (AHN), 2005 WL 677806, at *2 (D. Conn. Mar. 23, 2005) (under the moderate approach, "if major changes are made to the complaint, major changes can be made to the response.").

### 3. The Counterclaim Certainly Satisfied the "Permissive" Approach

Finally, there can be no dispute that NTG satisfied the permissive approach. *See City of W. Sacramento, California v. R & L Bus. Mgmt.*, No. 2:18-CV-900 WBS EFB, 2019 WL 2249630, at *1–2 (E.D. Cal. May 23, 2019) (applying the permissive approach, which allows a counterclaim to be filed without leave whenever the plaintiff amended the complaint); *see also* 3-ER-463 ("the Counterclaim also satisfies the permissive approach."). The Order does not address the permissive approach at all.

### B. A Reasonable Reading of the Case Law Indicated the Counterclaim Was Not Time Barred

The District Court's finding that a "cursory legal inquiry should have revealed" the FACC to be time barred is erroneous. (1-ER-43,

46-47). As a preliminary matter, it should be noted that "pursuing a RICO claim is very complex and difficult," *Walker-Cook v. Integrated Health Res., LLC*, No. CV 12-00146 ACK-RLP, 2012 WL 12893272, at *16 (D. Haw. Oct. 3, 2012), and statute of limitations jurisprudence is no exception. It is not as though Appellants simply overlooked the four-year statute. It includes specific allegations of conduct and injury within the statutory period, including in 2017 and 2019. *Supra*.Part.II.C. Where conduct occurring outside the statutory period was alleged – such as a false 2014 declaration from NIC's counsel – detailed delayed discovery and fraudulent concealment allegations were included. *See e.g.*, 5-ER-877, ¶ 166; G*rimmett v. Brown*, 75 F.3d 506, 514 (9th Cir. 1996) ("Equitable tolling doctrines, including fraudulent concealment, apply in civil RICO cases.").

As the Order acknowledges under RICO "separate accrual rule, a plaintiff can 'still obtain RICO recovery for injuries arising during the limitations period[,]' but 'damages may not be recovered for injuries sustained as a result of acts committed outside the limitations period.'" 1-ER-43-44 *quoting Tanaka v. First Hawaiian Bank*, 104 F. Supp. 2d 1243, 1251 (D. Haw. 2000). The FACC closely tracks this rule, alleging that damages incurred "constitute a new and

accumulating injury that is separate and independent from injuries Counterclaimants sustained from Counter-Defendants' other earlier predicate acts . . . ." 5-ER-858, ¶ 92; 888 ¶ 217. Moreover, as Appellants pointed out to the District Court, 2-ER-235-241, there is the issue of tolling brought on by NIC filing its Complaint. "The Ninth Circuit has not yet decided whether or for what type of counterclaims the filing of a complaint tolls a statute of limitations." *Szanto v. Szanto*, No. 3:18-CV-951-SI, 2020 WL 7419215, at *4 (D. Or. Dec. 18, 2020). But at a minimum, "[t]he weight of authority [is] that the filing of a complaint tolls the statute of limitations for compulsory counterclaims." *Orange Cty. Health Care Agency v. Dodge*, 793 F. Supp. 2d 1121, 1129 (C.D. Cal. 2011).

Given allegations of injury within the statutory period, probable tolling as of NIC's filing date (December 7, 2015), and delayed discovery and separate accrual allegations, it is difficult to see how Appellants could have foreseen the entire FACC being deemed time barred. Indeed, the Order reaches this result only by literally copying[3]

---

[3] The Order appears to have copied NIC's Reply Brief statement that "NTG provides no precedent to the contrary." *Compare* 1-ER-44 *with* 2-ER-255. The statement is not accurate as NTG provided a detailed response. (3-ER-432, fn. 5).

NIC's reply argument that "NTG's only injury is legal fees in defending against NIC's RICO suit." *Compare* 1-ER-44 *with* 2-ER-255 (same language, citing same cases, and same case quotations).

By doing so, the Order imported NIC's misstatement of the FACC and of the law. Contrary to NIC's representation to the District Court, the FACC *did not* generally claim that having to defend from NIC's suit was its "injury." As discussed in more detail with regard to *Noerr-Pennington*, NTG's overall theory was not that NIC's suit lacked "probable cause." *Infra.*Part.III.C. NTG never alleged the filing of NIC's lawsuit to be a RICO predicate. (5-ER-885-886, ¶¶ 203-5). Rather, NTG alleged that specific serious frauds by NIC resulted in specific injuries. (5-ER-888, ¶ 217). NTG claimed that "in August 2019, Counterclaimants were put to significant expense defending against false declarations accusing Ferrell of perjury," that "[o]n February 28, 2019, Counterclaimants were injured by having summary adjudication entered against them based on NIC's false representation that Baker was not acting as NIC's agent," that "[p]rior to that, Counterclaimants incurred significant legal expenses and costs addressing the extortion and false statements by NIC's agent, Baker," and that "in approximately October of 2017, Counterclaimants learned

that they had been injured through a false declaration filed by Negrete." *Id.*

NIC and the Order rely on *N. Tr. Co. v. Ralson Purina Co*., No. 94 C 4045, 1994 WL 605743, at *8 (N.D. Ill. Nov. 3, 1994) for the proposition that "litigation expenses incurred after an overt act do not extend the statute of limitations." (1-ER-44). In that case's 26-year history, the District Court is the second to cite it. *See N. Tr. Co. v. Ralson Purina Co.,* 1994 WL 605743 (citing references: courts). Imposing sanctions based on a footnote in such an unpublished, out-of-circuit, non-binding district court opinion is wildly inappropriate and grossly unjust to counsel.

Moreover, NIC and the District Court are wrong on the substance. Here, timeliness is not dependent on "extend[ing] the statute of limitations" after an overt act, but rather on the date of injury caused by alleged predicate acts. That multiple injuries include attorneys' fees is irrelevant. While not clearly stated in the Order, the position the District Court adopted is actually NIC's argument that incurring legal fees are "a singular and continuing injury that relates back to the filing of [the] lawsuit under Ninth Circuit law." (4-ER-732-733). NIC cited *Pace Indus., Inc. v. Three Phx. Co.*, 813 F.2d

234, 239 (9th Cir. 1987) for the supposed rule and NTG explained that the *Pace* decision held no such thing. (3-ER-432, fn. 5). That case did not purport to set out any special rule for attorneys' fees as NIC claims. *Id.* Rather, in that case the specifically alleged legal wrong was "the attempted enforcement of an illegal contract through judicial process so "the initiation of judicial proceedings [was] the last overt act for purposes of the statute of limitations." 813 F.2d at 237. Unlike the FACC allegations, there were not allegations of new legally wrongful acts that caused the attorneys' fees. *Id.*; 5-ER-888, ¶ 217.

This Court's subsequent decision in *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1272 (9th Cir. 2022) confirms that Appellants were correct and NIC and the District Court were wrong. There, this Court explained that *Pace* was part of a line of cases where the "later events, although injurious, were not themselves actionable" and which "involved challenges not to new wrongful acts, but rather to the inevitable—and not independently unlawful—consequences of the operative, time-barred decision." *Id.* Far from setting forth some special rule where attorneys' fees are a "singular injury" that "relates back to the filing of [the] lawsuit," this

Court paraphrased *Pace* as "holding that each phase of a single enforcement action does not give rise to new, actionable overt acts." *Id.* at 1272. Because here the "later events" are expressly alleged predicate acts under RICO, *Pace* has no applicability. (5-ER-885-886, ¶¶ 203-206).

Absent NIC's made up rule that litigation injuries are legally "singular" and "relate back" to the initial filing date, the Order's statute of limitations findings implode. There are express allegations of injury "beginning in August 2019," on "February 28, 2019," and of the discovery of injury in October 2017. (5-ER-888, ¶ 217). Even if the first of those were to be eliminated on *Noerr-Pennington* grounds, there would still be at least two injuries within the four-year statutory period.

Accordingly, the District Court's finding that a "cursory legal inquiry should have revealed" the FACC to be time barred is erroneous.

## C. **Reasonable Investigation Showed that the False Perjury Claims Likely Fell within the Fraud Exception**

The District Court similarly erred in holding that a "cursory legal inquiry should have revealed" the False Perjury claims to be

subject to *Noerr-Pennington*. The District Court erred on the necessity of these allegations to the overall FACC and as to the adequacy of the "fraud exception" allegations.

As with the statute of limitations, this was not a matter of counsel overlooking or failing to research an issue. Appellants are closely familiar with the *Noerr-Pennington* doctrine and the fraud exception to it. They briefed it many times in the underlying litigation. (*See* 10-ER-2246-2374; 10-ER-2229-2245; 3-ER-416-447). Appellant Sabovich has published multiple articles on petition immunity throughout his career and been favorably cited by the Seventh Circuit. *Mercatus Grp., LLC v. Lake Forest Hosp*., 641 F.3d 834, 847 (7th Cir. 2011) (citing James M. Sabovich, *Petition Without Prejudice: Against the Fraud Exception to Noerr–Pennington Immunity From the Toxic Tort Perspective*, 17 Penn. St. Envtl. L.Rev. 1, 12 (2008).) The language of the FACC is expressly drafted in conformance with this Court's requirements for alleging the fraud exception to *Noerr-Pennington*. *Compare* 5-ER-858-859, ¶ 93 and 877, ¶ 165 *with Sosa v. DIRECTV*, Inc., 437F.3d 923, 936 (9th Cir. 2006). As discussed in more detail below, the *Noerr-Pennington* issue addressed by the District Court involved a complex, unsettled,

and even conflicting area of law

### 1. The False Perjury Claims Are Not Dispositive of the Statute of Limitations as the District Court Found

As discussed above, *supra*.Part.III.B, the District Court's statute of limitations ruling is based on it invoking a non-existent rule that attorneys' fees are always regarded as a singular injury. It is thus perplexing that the District Court, after already finding all claims to be time barred, states that the False Perjury allegations are "critical for statute of limitation purposes." (1-ER-46). They are not. There are, *inter alia*, express allegations of different injuries on February 28, 2019, and October 2017. (5-ER-888, ¶ 217). Because other claims would remain, whether or not the False Perjury allegations are viable has no effect on whether the RICO claim is barred by the statute of limitations.

### 2. The District Court Erred in Finding that NTG Could Not Satisfy the Fraud Exception to *Noerr-Pennington*

The FACC alleged grotesque litigation misconduct, which must be presumed true at the pleading stage. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007). Scott Ferrell offered truthful testimony that "Ms. Carlberg was a close friend of my

family" who "began living in our home in 2011 because she was very

ill with cancer and needed our support and assistance," and that she

"stayed with the Ferrell family 'the latter part of 2011 through the

early part of 2012, when she moved into a hospice facility, where she

stayed until shortly before her death on May 5, 2012.'" (5-ER-839, ¶

52). Scott Ferrell testified that "[o]n December 24, 2011," he learned

that she was taking NIC's product, discussed it with her, was retained

to represent her, and sent NIC a demand letter. (*Id.* 839-840, ¶¶ 53-

54).

Around April 2019, NIC "developed a scheme to move for

sanctions based on" Ferrell's truthful declaration. (*Id.* 839, ¶ 51. NIC

moved for "death penalty" sanctions based on declarations from

Trycia Carlberg's mother and two alleged close friends of hers. (5-

ER-841-842, ¶ 58; 845 ¶ 61). NIC explained that "[e]ach witness

testified that Ferrell's declaration described an impossible set of

circumstances. Trycia never resided or lived at the Ferrells' home in

December 2011—a fact which undermines every material position in

Ferrell's declaration." (5-ER-845, ¶ 61). According to NIC and its

witnesses, Trycia Carlberg only lived with the Ferrell family "for a

brief period in March 2012." (5-ER-850, ¶ 70).

62

This was categorically false and NIC knew it. "The documentary evidence in the form of photographs, emails, and other written documents conclusively showed that Trycia Carlberg did, in fact, live with the Ferrells from late 2011 through early 2012, consistent with Ferrell's testimony, and that Trycia Carlberg did spend time at the Ferrells' home during [] Christmas 2011." (*Id.* 854-855, ¶ 84). Worse still, other claims – all of which are demonstrably false – appear in all the declarations. (*Id.* 841-845, ¶¶ 58-60. NTG specifically alleged that NIC and others knew the statements were false. (*Id.* 846-848, ¶¶ 64, 66). As to NIC's core claim that Trycia Carlberg only lived with the Ferrells briefly in March 2012 and not in December 2011, one of the witnesses told NIC's counsel, "'I cannot sign this due to dates that she actually did stay at their house . . . My dates, looking back on Trycia[']s Facebook are wrong. I see pics of her at their [the Ferrells'] house during Nov, Dec, Feb and March.'" 5-ER-848-849, ¶ 67; *see also id.*, 849-852, ¶¶ 68-79 (detailed allegations regarding knowledge of falsity). While NIC did withdraw the sanctions motion, it nonetheless "proceeded to double down and file even more false statements and declarations before [the District Court] in connection with its Sur-Reply to NTG's Motion for

Sanctions." (5-ER-853-854, ¶ 81, 855-857, ¶¶ 85-89).

Read as a whole, the FACC alleges a premediated scheme to obtain a fraudulent judgment by framing an innocent man for felony perjury. Under this Court's fraud exception to *Noerr-Pennington*, set out in *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1060 (9th Cir. 1998), there is no immunity when "a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." Significantly, this Court quoted *Liberty Lake Inv., Inc. v. Magnuson*, 12 F.3d 155, 158 (9th Cir.1993) and cited *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1260 (9th Cir.1982) ("*Clipper Exxpress*") for the rule. *Id.*; *see also* Sabovich (2008) at *9-10 (tracing the history of the Ninth Circuit's fraud exception back to the 1965 *Walker Process* exception to antitrust liability). *Clipper Exxpress*, in turn, indicates that this rule did not necessarily require that the alleging party prove that the adjudicator body relied on the misrepresentation. There was no "require[ment] that the body on whom the fraudulent misstatements are pressed ultimately believe those statements." 690 F.2d at 1262. That court went on to explain that the "[a]dministrative bodies and courts . . . rely on the information presented by the parties before

them" and "[t]he recognition, however, of a private right of action based on the fraudulent misrepresentation, might be sufficient incentive to induce parties not to fraudulently misrepresent facts." *Id.*

Here, the FACC explained in detail why NIC's frauds "were so serious as to deprive the litigation of its legitimacy." (5-ER-858-859, ¶ 93). It sought to deprive NTG of its fundamental right to a jury trial, it went to an issue that "was central to this litigation," and it was used in an effort to obtain "disciplinary action" against Ferrell. *Id.* Further, it was done to "induce fear on the part of Ferrell and thereby convince him to agree to pay money to NIC and waive his legal rights." (*Id.* 841, ¶ 56). Regardless of whether the sanctions motion succeeded or not, NIC had signaled its capacity to frame Ferrell for crimes and proven it could do so with impunity.

Nonetheless, the Order found as a matter of law that the fraud had not "deprive[d] the litigation of its legitimacy" because "the allegedly false declarations that are at the center of the 2019 conduct were promptly withdrawn by NIC when contrary evidence came to light" and were not relied upon. (1-ER-46). That is legally and factually inaccurate. NTG detailed how NIC filed false statements and declarations *after* the sanctions motion was withdrawn. (5-ER-

853-854, ¶ 81). For example, NIC filed a statement from Trycia Carlberg's mother that Trycia "came Christmas Eve and spent the night," even though NIC literally had "photographs showing Trycia with the Ferrells in their home at 10:11 P.M., 10:25 P.M., 11:17 PM on December 24, 2011 and 12:49 A.M. and 1:00 A.M. on December 25, 2011." *Id.*; *see also* 855-856, ¶ 86 (alleging additional false statements after withdrawal of sanctions motion). And the District Court did rely on these false statements as it denied NTG's request for an order to show cause. (7-ER-1421).

Legally, the Order is incorrect that reliance is an absolute requirement for the fraud exception to *Noerr-Pennington* for three separate and independent reasons. First, as seen above, *Clipper Exxpress* rejected an absolute reliance requirement. Second, such a requirement would by definition be inapplicable. The case was, at the time, ongoing and NIC's false declarations were signed by individuals who would be trial witnesses. (3-ER-328). Moreover, NIC had filed multiple declarations affirming their prior false testimony. (5-ER-853-854, ¶ 81). It simply cannot be said that intentionally false testimony on a core issue did not deprive the litigation of its legitimacy when the litigation had not yet concluded.

Third and finally, the circumstances alleged by the FACC are unique and far more serious than in cases where the fraud did not deprive the litigation of its legitimacy. The cases relied upon by the Order, such as *Thomas v. Hous. Auth. of Cnty. of Los Angeles*, No. CV046970MMM(RCX), 2006 WL 5670938, at *9 (C.D. Cal. Feb. 28, 2006) and *Swallow v. Torngren*, No. 17-CV-05261, 2018 WL 2197614, at *10 (N.D. Cal. May 14, 2018), *aff'd*, 789 F. App'x 610 (9th Cir. 2020), involve comparatively immaterial acts like improper discovery responses or alleged irregularities, not premediated efforts to fix a trial by framing a party.

The Order citation to *Swallow* only underscores the unique nature of this case. *Swallow* was a gambling "conspiracy theory" case in which plaintiff alleged, "the disciplinary proceeding initiated by California's Bureau of Gambling Control to revoke his gambling license was part of a larger conspiracy" involving everyone from the "Prosecuting Deputy Attorney General" to his "estranged wife." *Id.* at *1. Following a seven-day disciplinary trial, the ALJ issued a proposed decision. *Id.* at *2. However, the "Commission rejected the ALJ's proposed decision" and issued its own order revoking the plaintiff's license and denying renewal. *Id.* The plaintiff responded

with a RICO complaint claiming that the proceeding was "plagued with a number of irregularities." *Id.* at \*2. After finding that allegations against the prosecutor were subject to absolute immunity, the court went on to assess whether *Noerr-Pennington* immunity applied to the non-prosecutor defendants. *Id.* at \*7-\*8. The court found that under the specific facts of that case, the fraud exception was "inapplicable because the FACC and supporting exhibits conclusively show that [plaintiffs'] identified issues did not deprive the disciplinary proceeding of its legitimacy." *Id.* \*8.

The facts of this case have nothing in common with *Swallow*. Most fundamentally, in *Swallow*, there was a ***trial*** where the plaintiff was "permitted to submit evidence and make arguments" and his claims were fully considered. *Id.* at \*3. Here, the Order provided the opposite result – that NTG was precluded from presenting its arguments and evidence at trial. Moreover, the allegations in *Swallow* were trivial compared to those alleged in the FACC. In *Swallow*, the RICO claim was essentially a disgruntled litigant complaining about his trial. *Swallow* also involved claims of trial "irregularities," such as supposed prejudice from the "unexpected appearance on the first day of the hearing" by a Deputy Attorney General, *id.* at \*8, and quibbling

with various witnesses' trial testimony based on "diminished credibility" and "motives." Unlike the plaintiff in *Swallow*, NTG did not "simply recast disputed issues from the underlying litigation as misrepresentations by the other party." *Kottle v. Nw. Kidney Ctrs*., 146 F.3d 1056, 1063 (9th Cir. 1998).

## D. The District Court Erred in Awarding Sanctions When There Was No Showing that Allegations Were Made without a Reasonable Inquiry

Finally, the Order erred in not requiring any showing that Appellants failed to conduct a "reasonable and competent inquiry" prior to filing the FACC. Such a showing is mandatory and courts routinely deny Rule 11 motions when no such showing is made. *Harara v. ConocoPhillips Co*., No. C04-0515 BZ, 2005 WL 240773, at *1 (N.D. Cal. Jan. 27, 2005) (Denying Rule 11 motion when "Harara's motion for sanctions does little more than restate the arguments in his motion to dismiss" and "[h]e has not presented any evidence that Conoco failed to engage in a reasonable and competent inquiry prior to the filing of its counterclaims . . . ."); *Elettronica GmbH v. Radio Frequency Simulation Sys., Inc*., No. SACV1601523AGKESX, 2017 WL 6888258, at *1 (C.D. Cal. Aug.

21, 2017) ("What's worse, Defendants' motion doesn't adequately discuss whether Plaintiff's counsel conducted a 'reasonable and competent inquiry before filing the operative complaint' as required by the Ninth Circuit's decision in Christian, 286 F.3d at 1127."); *Syran v. LexisNexis Grp*., No. 05-CV-0909-LAB (JMA), 2005 WL 8149144, at *4 (S.D. Cal. Nov. 9, 2005) (Denying Rule 11 motion when "Defendants have not demonstrated on the current record that Plaintiff's counsel failed to engage in a reasonable and competent inquiry prior to filing the Complaint.")

The Order sidesteps this issue by relying on *Lima v. Deutsche Bank Nat. Tr. Co*., No. CIV. 12-00509 SOM, 2013 WL 5890662, at *5 (D. Haw. Oct. 30, 2013), *aff'd sub nom. Lima v. Deutsche Bank Nat'l Tr. Co*., 687 F. App'x 606 (9th Cir. 2017), for the rule that a "baseless [legal] claim by definition will show the inquiry was not competent and reasonable." (1-ER-47). However, this rule applies to simple issues like alleging "the required elements," where "[e]ven the most cursory legal inquiry [should] reveal [the deficiency.]" *Holgate v. Baldwin*, 425 F.3d 671, 677 (9th Cir.2005); *Horisons Unlimited v. Santa Cruz-Monterey-Merced Managed Med. Care Comm'n*, No. 1:14-CV-00123-LJO-MJ, 2014 WL 3342565, at *21 (E.D. Cal. July 2,

2014) (declining sanctions when legal issue "requires more analysis than a 'cursory legal inquiry' to determine the merit of Horisons' claim."). Application of the rule to complex, conflicting, and largely unsettled areas of law is inappropriate.

Moreover, the District Court failed to conduct the analysis *Lima* required. As that case indicated, the inquiring court must answer "did the attorney 'perform adequate legal research that confirms whether the theoretical underpinnings of the complaint are warranted by existing law or a good faith argument for an extension, modification or reversal of existing law'?" 2013 WL 5890662, at *5 *quoting Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir.2002) (internal quotation omitted).

The Order fails to address this question. For each issue –when leave is required, whether the Counterclaim was compulsory, the statute of limitations, and *Noerr-Pennington* – the Order neglects to evaluate whether Appellants had "some plausible basis, [even] a weak one" for the position taken. *United Nat. Ins. Co. v. R & D Latex Corp.*, 242 F.3d 1102, 1117 (9th Cir.2001). Indeed, as discussed more fully above, the Order largely ignored NTG's arguments and authority. The case law supporting that the Counterclaim was

probably compulsory, setting forth the correct standard for when leave is required under the "moderate" approach, following the "permissive" approach, and tolling the statute for compulsory counterclaims, were all ignored. *Supra*.Parts.III.A-B.

NTG cited controlling Ninth Circuit authority rejecting an absolute reliance requirement, *Clipper Exxpress*, but that too was disregarded. Alleged facts inconsistent with the District Court's ruling, such as that NTG had alleged multiple injuries within the statutory period, and that NIC had filed false declarations ***after*** withdrawing its sanctions motion, were similarly disregarded. Worse still, the Order is largely based on district court cases, which is not an appropriate basis for sanctions. "As appreciative as any judge may be of another judge's reliance and reiteration of a ruling, "[t]he simple fact that an attorney's legal theory failed to persuade the district court" does not render that theory baseless." *Lima*, 2013 WL 5890662, at *4 *quoting Operating Engineers Pension Trust v. A–C Co*., 859 F.2d 1336, 1345 (9th Cir. 1988).

Accordingly, the Order erred in not requiring any showing that Appellants failed to conduct a "reasonable and competent inquiry" prior to filing the FACC.

## IV.   **<u>CONCLUSION</u>**

For the foregoing reasons, the Order should be **REVERSED**.


Dated:  March 1, 2023          **CALLAHAN & BLAINE, APLC**

By:  /s/ James M. Sabovich
     David J. Darnell
     James M. Sabovich
     Appellants Pro Se

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Circuit Rule 32-1(a) and Federal Rules of Appellate Procedure 32(a)(5)(A). This brief uses a proportional typeface and 14-point font, and contains 13,208 words and is 75 pages.

Dated: March 1, 2023      **CALLAHAN & BLAINE, APLC**

By: /s/ James M. Sabovich
      David J. Darnell
      James M. Sabovich
      Appellants Pro Se

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ James M. Sabovich
James M. Sabovich